HAMILTON, Circuit Judge.
Plaintiff Bryana Bible obtained a student loan under the Federal Family Education Loan Program. She defaulted in 2012 but promptly agreed to enter into a rehabilitation agreement that required' her to make a series of reduced monthly payments. She timely made all of the payments that were required of her under this agreement, and she remains current on her loan payments. Although Bible complied with her obligations under the repayment agreement, a guaranty agency assessed over $4,500 in collection costs against her.
The terms of Bible’s loan were governed by a form document known as a Federal Stafford Loan Master Promissory Note (MPN). This form has been approved by the U.S. Department of Education and is used in connection with many student loans across the country. The MPN incorporates the Higher Education Act and its associated regulations. In pertinent part, the MPN provides that Bible must pay “reasonable collection fees and costs, plus court costs and attorney fees” if she defaults on her loan. As we will see, “reasonable collection fees and costs” are defined by regulations issued by the Secretary of Education under the authority expressly conferred by the Higher Education Act. The MPN provided that Bible would owe only those collection costs that are permitted by the Higher Education Act and its regulations.
Bible sued the guaranty agency (defendant United Student Aid Funds, Inc.) alleging breach of contract and a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq. Her breach of contract theory is that the MPN incorporated federal regulations that prohibit the guaranty agency from assessing collection costs against her because she timely entered into an alternative repayment agreement and complied with that agreement. Her RICO claim alleges that the guaranty agency, in association with a debt collector and a loan service provider, committed mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 when it assessed collection costs of more than $4,500 against her despite its representations that her “current collection cost balance” and “current other charges” were zero and that these costs would be “reduced” once she completed the rehabilitation process.
The district court granted the guaranty agency’s motion to dismiss Bible’s first amended class action complaint (we call this the “amended complaint”) under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. The district court held that both claims were *639 “preempted” by the Higher Education Act. It reasoned that both claims depend on alleged violations of the Act and should not be permitted because the Act does not provide a private right of action. The district court held in the alternative that the amended complaint failed to state a claim that is plausible on its face. It concluded that the breach of contract claim failed because both the MPN and the Higher Education Act expressly permit imposing collection costs against borrowers who default on their loans. The district court also concluded that the RICO claim failed because Bible’s amended complaint “has not shown participation in a scheme to defraud; commission of an act with intent to defraud; or the use of mails or interstate wires in furtherance of a fraudulent scheme.” Bible v. United Student Aid Funds, Inc., No. 1:13-CV-00575TWP-TAB, 2014 WL 1048807, at *10 (S.D.Ind. Mar. 14, 2014).
We reverse. Neither of Bible’s claims is preempted by the Higher Education Act. Bible’s state law breach of contract claim is not preempted because it does not conflict with federal law. The contract at issue simply incorporates applicable federal regulations as the standard for compliance. Accordingly, the duty imposed by the state law is precisely congruent with the federal requirements. A state law claim that does not seek to vary the requirements of federal law does not conflict with federal law.
We apply the Secretary of the Education’s interpretation of the applicable statutes and regulations, which is consistent with Bible’s. (The Secretary accepted our invitation to file an amicus brief addressing the question.) The Secretary interprets the regulations to provide that a guaranty agency may not impose collection costs on a borrower who is in default for the first time but who has timely entered into and complied with an alternative repayment agreement. Nor is Bible’s RICO claim preempted. RICO is a federal statute and thus is not preempted by another federal statute, and we see no conflict between RICO and the Higher Education Act. On the merits, both the breach of contract and RICO claims satisfy the plausibility standard under Rule 12(b)(6).
I. Factual and Procedural Background
We review de novo a district court’s decision to grant a motion to dismiss under Rule 12(b)(6). E.g., CEnergy-Glehmore Wind Farm No. 1, LLC v. Town of Glenmore, 769 F.3d 485, 487 (7th Cir. 2014). We accept as true all factual allegations in the amended complaint and draw all permissible inferences in Bible’s favor. E.g., Fortres Grand Corp. v. Warner Bros. Entertainment Inc., 763 F.3d 696, 700 (7th Cir.2014). To avoid dismissal under Rule 12(b)(6), Bible’s amended complaint “must contain sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible on its face.’ ” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). “A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” Id. “Plausibility” is not a synonym for “probability” in this context, but it asks for “more than a sheer possibility that a defendant has acted unlawfully.’ ” Olson v. Champaign County, 784 F.3d 1093, 1099 (7th Cir.2015), quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.
In deciding a Rule 12(b)(6) motion, the court may consider documents attached to a complaint, such as contract documents, without converting the motion *640 into one for summary judgment. See Fed. R.Civ.P. 10(c). Bible attached the following documents to her amended complaint: (1) the promissory note or MPN, (2) an April 12, 2012 letter to Bible from General Revenue Corp. (GRC), which we call the “default letter,” (3) an application for loan rehabilitation sent by GRC on April 27, 2012, which we call the “rehabilitation agreement,” (4) a copy of Bible’s payment history with the defendant guaranty agency United Student Aid Funds, Inc., and (5) a copy of a contract between USA Funds and Sallie Mae Corp.[1]
A. The Higher Education Act and Regulatory Background
Congress enacted the Higher Education Act of 1965 (HEA or the Act), now codified as amended at 20 U.S.C. § 1001 et seq., “to keep the college door open to all students of ability, regardless of socioeconomic background.” Rowe v. Educational Credit Management Corp., 559 F.3d 1028, 1030 (9th Cir.2009) (citation and internal quotation marks omitted); see also 20 U.S.C. § 1070(a) (identifying purpose of the statute). Among other things, the Act created the Federal Family Education Loan Program (FFELP), “a system of loan guarantees meant to encourage lenders to loan money to students and their parents on favorable terms.” Chae v. SLM Corp., 593 F.3d 936, 938-39 (9th Cir.2010) (footnote omitted). The Secretary of Education administers the FFELP and has issued regulations to carry out the program.
In general, the FFELP regulates three layers of student loan transactions: (1) between lenders and borrowers, (2) between borrowers and guaranty agencies, and (3) between guaranty agencies and the Department of Education. See Chae, 593 F.3d at 939. Under the program, lenders use their own funds to make loans to students attending postsecondary institutions. These loans are guaranteed by guaranty agencies and reinsured by the federal government. See 20 U.S.C. § 1078(a)-(c). Because of the reinsurance commitment, the federal government serves as the ultimate guarantor on each loan.
This lawsuit deals primarily with the second layer of transactions — the relationship between a student borrower who has defaulted for the first time and her guaranty agency. When a borrower defaults on a loan and the lender is unable to recover the amount despite due diligence, the lender notifies the guaranty agency of *641 the default and the guaranty agency purchases the loan from the lender. See Chae, 593 F.3d at 939. Once the lender has transferred the debt to the guaranty agency, that agency may recover its losses from the Department of Education. See 20 U.S.C. § 1078(c)(1)(A), (E); 34 C.F.R. § 682.406(a). The guaranty agency must then take numerous steps to collect the defaulted student loan. The regulations at issue here relate to this stage of the process.
To understand these regulations, some background is helpful. In the mid-1980s, Congress grew concerned that federal taxpayers were effectively footing the bill for the costs of collecting defaulted student loans. In 1986 Congress amended the HEA to require guaranty agencies to assess collection costs against borrowers to prevent these costs from being passed on to federal taxpayers. See Black v. Educational Credit Mgmt. Corp., 459 F.3d 796, 799 (7th Cir.2006). The relevant statutory provision provides simply that “a borrower who has defaulted on a loan ... shall be required to pay ... reasonable collection costs.” 20 U.S.C. § 1091a(b)(l). Congress chose not to define the meaning of “reasonable collection costs” in the statute and instead “left it up to the Secretary [of Education] to interpret that term through regulations.” Black, 459 F.3d at 799; 20 U.S.C. § 1082(a)(1) (delegating authority to the Secretary of Education to “prescribe such regulations as may be necessary to carry out the purposes” of FFELP).
The regulations define “reasonable collection costs.” Two regulations are central to this lawsuit.[2] We describe these regulations in detail below, and we ultimately agree with the interpretation of the Secretary of Education, which is consistent with Bible’s. In short, 34 C.F.R. § 682.405 provides that guaranty agencies must create loan rehabilitation programs for all borrowers who have enforceable promissory notes, and 34 C.F.R. § 682.410 establishes fiscal, administrative, and enforcement requirements that a guaranty agency must satisfy to participate in the FFELP. One requirement is that a guaranty agency must give a borrower who has defaulted notice and the opportunity to enter into a repayment agreement before it assesses collection costs or reports the default to a consumer reporting agency. 34 C.F.R. § 682.410(b)(5)(ii)(D). The guaranty agency is not permitted to charge collection costs to the borrower if (1) this is the first time the borrower has defaulted, (2) she enters into a repayment agreement within 60 days of receiving notice that the guaranty agency has paid the default claim, and (3) she complies with that agreement. Imposing collection costs on a borrower under these circumstances would be “unreasonable” within the meaning of 20 U.S.C. § 1091a(b)(l).
B. Bible’s Loan, Default, and Decision to Enter into the Rehabilitation Agreement
In June 2006, Bible obtained a student loan. The written agreement governing her loan is the Federal Stafford Loan Master Promissory Note (MPN), which identifies Citibank as the “Lender” and defendant United Student Aid Funds (USA *642 Funds) as the “Guarantor, Program, or Lender.” The MPN expressly incorporates the Higher Education Act and its associated regulations into the terms of the contract: “Loans disbursed under this MPN are subject to the annual and aggregate loan limits specified in the Higher Education Act of 1965, as amended, 20 U.S.C. [§ ] 1070, et seq., and applicable U.S. Department of Education regulations (collectively referred to as the ‘Act’).”
The contract term covering “late charges and collection costs” states:
The lender may collect from me: (i) a late charge for each late installment payment if I fail to make any part of a required installment payment within 15 days after it becomes due, and (ii) any other charges and fees that áre permitted by the Act for the collection of my loans. If I default on any loans, I will pay reasonable collection fees and costs, plus court costs and attorney fees.
(Emphasis added.) The “governing law and notices” term provides: “The terms of this MPN will be interpreted in accordance with the applicable federal statutes and regulations, and the guarantor’s policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN.”
In 2012, Citibank determined that Bible was in default and transferred the debt to USA Funds, which paid Citi-bank’s default claim. To comply -with its obligations under the HEA and its associated regulations, USA Funds, through its agent General Revenue Corp. (GRC), mailed Bible a form letter dated April 12, 2012 saying that her loan was in default and identifying several options for resolving her debt, including the opportunity for loan rehabilitation. This default letter included a table with the following information:
[[Image here]]
The letter noted that Bible’s current total amount due was $18,062.60.
Between April 12 and April 25, Bible and her attorney spoke to GRC on the phone three times to negotiate a loan rehabilitation agreement. Bible and GRC agreed on a rehabilitation plan requiring monthly payments of $50. On April 27, GRC faxed Bible a form rehabilitation agreement. Bible promptly signed the agreement and returned it by fax on April 30, 2012.
The rehabilitation agreement included another table, identical to the one displayed in the default letter except for the current interest column:
*643 [[Image here]]
The agreement also said that Bible’s current total amount due was $18,112.85. Accumulating interest accounted for the $50.25 increase in Bible’s total balance. The figures for her “current collection cost balance” and “current other charges” remained at all times $0.
Five paragraphs above the signature line, toward the end of the rehabilitation agreement, the following language appears:
Once rehabilitation is complete, collection costs that have been added will be reduced to 18.5% of the unpaid principal and accrued interest outstanding at the time of Loan Rehabilitation. Collection costs may be capitalized at the time of the Loan Rehabilitation by your new lender, along with outstanding accrued interest, to form one new principal amount.
The paragraph immediately above the signature line states: “By signing below, I understand and agree that the lender may capitalize collection costs of 18.5% of the outstanding principal and accrued interest upon rehabilitation of my loan(s).”
After signing the rehabilitation agreement, Bible made nine on-time payments of $50. Although she fully complied with her obligations under this agreement, USA Funds assessed collection costs against her in the amount of $4,547.44." It applied her monthly payments toward the collection costs rather than the principal. When Bible filed this lawsuit, she had not completed the rehabilitation process. (Her loan had not yet been sold to an eligible lender.) She remains current on her loan under the terms of the rehabilitation agreement.
C. Procedural History
Bible filed a complaint individually and on behalf of a proposed class of other borrowers who had entered into loan agreements under the HEA but defaulted, later entered into similar rehabilitation agreements, and were assessed collection costs. She moved to certify the class and then filed an amended complaint alleging breach of contract under Indiana law and a violation of RICO, 18 U.S.C. § 1962(c). USA Funds moved to dismiss. The district court granted the motion to dismiss and entered a final judgment dismissing both claims with prejudice. It also denied as moot Bible’s motion for class certification. Bible appeals the district court’s decision regarding both claims. After oral argument, we invited the Secretary of Education to file an amicus brief addressing his interpretation of the relevant statutory framework and federal regulations. He did so, and the parties have responded to those views.
II. Analysis
We conclude that (A) Bible has stated a viable breach of contract claim under Indiana law; (B) federal law does not preclude Bible from pursuing this state-law *644 claim; and (C) Bible has stated a viable RICO claim under federal law, though it remains to be seen whether she can support that claim with evidence of fraudulent intent.
A. Breach of Contract Claim
“Under Indiana law, the elements of a breach of contract action are the existence of a contract, the defendant’s breach thereof, and damages.” U.S. Valves, Inc. v. Dray, 190 F.3d 811, 814 (7th Cir.1999), citing Fowler v. Campbell, 612 N.E.2d 596, 600 (Ind.App.1993). The parties agree that the MPN is a valid contract and that it governs the terms of Bible’s loan, including the consequences of her default. They disagree, however, about whether the amended complaint has adequately pled a breach of the MPN and resulting damages.[3]
1. Breach
a. Incorporation by Reference
Bible alleges that USA Funds breached the MPN by assessing collection costs even though she timely entered into a repayment agreement and complied with her obligations under that agreement. She argues that the MPN incorporated federal regulations that prohibit guaranty agencies from imposing collection costs against first-time defaulters who promptly agree to repay their loans within 60 days of receiving notice from the guaranty agency that it has paid the lender’s default claim and who have complied with that agreement. She relies on 34 C.F.R. §§ 682.405 and 682.410 and language in the MPN to the effect that the guaranty agency can collect from the borrower only “charges and fees that are permitted by the Act.”
We agree with Bible' that the MPN incorporated the HEA and its associated regulations. “Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and, therefore, may properly be considered in the construction of the contract.” I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co., 695 N.E.2d 1030, 1036 (Ind.App.1998); see also, e.g., Jones v. City of Logansport, 436 N.E.2d 1138, 1148 (Ind.App.1982) (contract incorporated federal occupational safety and health regulations). The page of the contract that sets out the terms of the loan refers to the HEA and its regulations no fewer than 16 times, though once would be enough. In addition to the more general governing law provision, which provides that the terms of the contract “will be interpreted in accordance with the applicable federal statutes and regulations,” the specific term covering “late charges and collection costs” states that “[t]he lender may collect from me ... any other charges and fees that are permitted by the Act.” And the contract defines “the Act” as the HEA “and applicable U.S. Department of Education regulations.”
USA Funds relies on a sentence in the MPN granting it the right to impose “reasonable collection fees and costs, plus court costs and attorney fees.” USA Funds reads this language in isolation to mean that it can impose collection costs at any time after the borrower has defaulted. This interpretation fails to give weight to the preceding sentence, which limits the lender’s power to impose only those charges and fees “that are permitted by the Act.” Basic,-principles of contract law *645 require a court to consider a contract’s provisions together and in a way that harmonizes them. E.g., Hinc v. Lime-O-Sol Co., 382 F.3d 716, 720 (7th Cir.2004) (Indiana law). If USA Funds charged Bible collection costs in violation of the HEA and its regulations, then it breached the contract.
b. Requirements for Imposing Collection Costs
Bible has plausibly alleged a breach of the MPN by alleging that USA Funds assessed collection costs that were not authorized by the Higher Education Act and its regulations. This conclusion is supported by two independent grounds. The author of this opinion agrees with the Secretary of Education and Bible that under the best interpretation of the statutes and regulations, the collection costs assessed here were prohibited. Cf. Perez v. Mortgage Bankers Ass’n, 575 U.S. ---,- 135 S.Ct. 1199, 1208 n. 4, 191 L.Ed.2d 186 (2015) (“Even in cases where an agency’s interpretation receives Auer deference, however, it is the court that ultimately decides whether a given regulation means what the agency says.”).
Second, this author and Judge Flaum agree that even if this were not the best interpretation of the statutes and accompanying regulations, it is at least a reasonable one, and we defer to that interpretation because it reflects the reasoned position of the Secretary of Education, who is tasked with administering the program. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).
i. The Statutory and Regulatory Requirements
Beginning with interpretation without deference to the agency, Bible acknowledges that guaranty agencies are required to impose collection costs on borrowers who have defaulted in certain circumstances. Both the HEA itself and the implementing regulations make this clear. See 20 U.S.C. § 1091a(b)(l) (“[A] borrower who has defaulted on a loan ... shall be required to pay ... reasonable collection costs.”); id. § 1078-6(a)(l)(D)(i)(II)(aa) (upon successful rehabilitation, a guaranty agency -may, in order to defray collection costs, “charge to the borrower an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of the loan sale”); 34 C.F.R. § 682.410(b)(2) (“[T]he guaranty agency shall charge a borrower an amount equal to reasonable costs incurred by the agency in collecting a loan.”).[4] Bible argues, however, that the regulations prohibit USA Funds from imposing collection costs in her circumstances: a first-time defaulter who she promptly agreed to enter into a rehabilitation agreement within 60 days of receiving notice that USA Funds had paid her lender’s default claim, and who has complied with that agreement. She contends that imposing collection costs in these circumstances is “unreasonable” under 20 U.S.C. § 1091a(b)(l).
Two key regulations define the phrase “reasonable collection costs” in § 1091a(b)(l). The first regulation, 34 C.F.R. § 682.405, requires guaranty agencies to create loan rehabilitation programs for all borrowers that have enforceable promissory notes. These programs are designed to give eligible borrowers an opportunity to rehabilitate defaulted loans so *646 that, upon successful rehabilitation, the loans may be purchased by eligible lenders and removed from default status. 34 C.F.R. § 682.405(a).[5]
A. loan is considered rehabilitated only after two requirements are met: (1) the borrower has timely made nine out of ten payments required under a monthly repayment agreement, and (2) the loan has been sold to an eligible lender. 34 C.F.R. § 682.405(a)(2)(i)-(ii). Subsection (b) of this regulation then establishes specific requirements for terms that must be included in the rehabilitation agreement. For example, the guaranty agency must provide the borrower with a written statement confirming the borrower’s “reasonable and affordable payment amount” and “informing] the borrower of the amount of the collection costs to be added to the unpaid principal at the time of the sale.” 34 C.F.R. § 682.405(b)(l)(vi).
The second regulation, 34 C.F.R. § 682.410, is even more specific. It establishes fiscal, administrative, and enforcement requirements that a guaranty agency must satisfy to participate in the FFELP. Paragraph (b)(2) addresses collection costs:
Collection charges. Whether or not provided for in the borrower’s promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency shall charge a borrower an amount equal to reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim. These costs may include, but are not limited to, all attorney’s fees, collection agency charges, and court costs. [Subject to certain exceptions not relevant here], the amount, charged a borrower must equal the lesser of—
(i) The amount the same borrower would be charged for the cost of collection under the formula in 34 C.F.R; [§ ] 30.60; or
(ii) The amount the same borrower would be charged for the cost of collection if the loan was held by the U.S. Department of Education.
34 C.F.R. § 682.410(b)(2). This paragraph makes clear that guaranty agencies must charge a borrower reasonable collection costs, and it establishes a cap on the maximum amount that can be charged by the guaranty agency. Paragraph (b)(2), however, does not specify the circumstances under which these costs may be assessed. That issue is addressed by other portions of § 682.410, which create procedural safeguards for student borrowers.
First, some context. Guaranty agencies have two primary ways of pushing student-borrowers to repay their defaulted loans: (1) reporting the delinquent account to a consumer reporting agency (which lowers the borrower’s credit rating) and (2) assessing collection costs against the borrower. Because the Department of Education was concerned about recent graduates facing these adverse consequences without first being given an opportunity to cure their defaults, it created protections in § 682.410(b)(5)(h). It provides that guaranty agencies must take certain actions before either reporting the default or assessing collection costs:
The guaranty agency, after it pays a default claim oh a loan but before it reports the default to a consumer reporting agency or assesses collection costs against a borrower, shall, within the timeframe specified in paragraph *647 (b)(6)(ii) of this section, provide the borrower with—
(A) Written notice that meets the requirements of paragraph (b)(5)(vi) of this section regarding the proposed actions;
(B) An opportunity to inspect and copy agency records pertaining to the loan obligation;
(C) An opportunity for an administrative review of the legal enforceability or past-due status of the loan obligation; and
(D) An opportunity to enter into a repayment agreement on terms satisfactory to the agency.
34 C.F.R,. § 682.410(b)(5)(ii) (emphasis added).
This provision does not specify a particular timeframe for these actions, but it includes two cross-references that do. First, subparagraph (b)(6)(ii) requires the guaranty agency to send the written notice mentioned in (b)(5)(ii) within 45 days of the date it pays the lender’s default claim. Second, subparagraph (b)(5)(iv)(B) requires the agency to give the borrower at least 60 days from the date of the initial notice to request administrative review of the loan.
Subparagraph (b)(5)(ii) effectively creates a safe harbor for borrowers who find themselves in default for the first time. When a borrower is first notified that a guaranty agency has paid a default claim on her loan, she has a 60-day window to request administrative review of the debt or to enter into a repayment agreement with the agency. If she does not take either action, the guaranty agency can then take collection actions against her, report her default to a consumer reporting agency, and assess collection costs against her in the amount specified by § 682.410(b)(2).
To be sure, subparagraph (b)(5)(iv)(B) mentions the opportunity to request administrative review of the loan obligation, not the opportunity to enter into a repayment agreement with the agency. But that is not a problem for Bible. Her point is that subparagraph (b)(5)(h) requires the guaranty agency to provide the borrower with all four things before reporting the debt to a consumer reporting agency or assessing collection costs, and one of those things (administrative review) triggers a waiting period of at least 60 days. The regulations do not force the borrower to choose between requesting administrative review and entering into a repayment program. The borrower has a right to request administrative review and then to decide whether to enter into a repayment agreement. Accordingly, the borrower has at least 60 days to enter into an alternative repayment agreement. That Bible did not request administrative review of her loan obligation in this case is beside the point; she had at least 60 days to do so, and before that time ran out, she entered into the rehabilitation agreement.
This understanding is confirmed by § 682.410(b)(6)(h), which requires the guaranty agency to inform the borrower “that if he or she does not make repayment arrangements acceptable to the agency, the agency will promptly initiate procedures to collect the debt,” such as garnishing her wages, filing a civil suit, or taking her income tax refunds. 34 C.F.R. § 682.410(b)(6)(h). What would be the point of warning the borrower that declining to make repayment arrangements would trigger costly debt collection activities if the guaranty agency could initiate these procedures and assess those costs regardless of whether she agrees to repay?
That the regulations create this sort of safe harbor is not surprising. Under USA *648 Funds’ interpretation of the regulations, a guaranty agency could assess collection costs against a borrower even though it was never forced to “initiate procedures to collect the debt.” This would allow the guaranty agency to charge for costly actions that it might never need to take, such as wage garnishment or filing a civil suit. This case illustrates the point. USA Funds assessed over $4,500 in collection costs even though it merely sent one letter, sent and received one fax, spoke to Bible and her attorney on the phone several times, and cashed Bible’s monthly checks.
The safe harbor of subparagraph (b)(5)(ii) also creates an incentive for first-time defaulters to rehabilitate their loans by voluntary repayment. If first-time defaulters knew that they would face collection costs regardless of whether they agree to repay, they would have less incentive to enter into the repayment program voluntarily. These regulations are designed to reward cooperation.
This concept of providing a borrower with notice and an opportunity to resolve the default before being subject to adverse consequences, such as credit reporting or collection costs, is not new. . When the Department first incorporated this concept into the FFELP regulations in 1992, it was actually borrowing from a requirement that had been imposed on guaranty agencies back in 1986 under the federal tax refund offset program. Under that program, guaranty agencies were required to provide borrowers with notice of the proposed offset and an opportunity to avoid that offset by entering into a satisfactory repayment agreement. See Letter from Lynn B. Mahaffie, Dep’t of Education, Dear Colleague Letter Gen-15-14, at 2-3 (July 10, 2015). The disputed regulations here are based on that same model: the defaulted borrower must be given an opportunity to avoid the adverse consequences by promptly agreeing to repay the debt voluntarily.
The intent to create this safe harbor is further shown by a related statutory provision dealing with credit reporting. Under the HEA, Congress expressly provided that before reporting the default to a consumer reporting agency, the guaranty agency must provide the borrower with notice that the loan will be reported as in default “unless the borrower enters into repayment.” 20 U.S.C. § 1080a(c)(4) (emphasis added). “[I]f the borrower has not entered into repayment within a reasonable period of time,” then the guaranty agency must report the default. Id. The clear implication of § 1080a(c)(4) is that if the borrower timely enters into repayment, then the guaranty agency may not report the loan as in default.
The Secretary of Education issued the disputed regulation here, 34 C.F.R. § 682.410(b)(5), to implement this statutory requirement found in § 1080a(c)(4). See Letter from Lynn B. Mahaffie, Dep’t of Education, Dear Colleague Letter Gen-15-14, at 2 (July 10, 2015), citing 57 Fed. Reg. 60280, 60355-56 (Dec. 18, 1992). Subparagraph (b)(5)(ii) discusses credit reporting and the assessment of collection costs in the exact same way: “but before it reports the default to a consumer reporting agency or assesses collection costs against a borrower.... ” USA Funds has given us no persuasive reason to treat one of the stated adverse consequences of default (a bad credit report) differently from the other (collection costs). Yet that is precisely what its interpretation of the statutory framework and related regulations would do.
This conclusion is based on the text of the applicable statutory provisions, regulations, and the MPN itself. USA Funds does not squarely address the textual basis of Bible’s claim but responds with three *649 arguments. First, it argues that § 682.410(b)(2) allows it to impose collection costs, and the regulations do not explicitly prohibit the imposition of collection costs against a borrower who has defaulted but promptly entered into a repayment agreement. This argument is not persuasive. Paragraph (b)(2) merely establishes the background rule that the guaranty agency must assess “reasonable collection costs” against the borrower and establishes the cap on the maximum amount of costs that can be charged. It does not say anything about the circumstances under which these costs can be imposed. As explained, other parts of the regulation such as subparagraph (b)(5)(ii) impose more specific requirements about the circumstances in which collection costs may be assessed.
Second, USA Funds contends that Bible’s interpretation of § 682.410(b)(5)(ii)(D) ignores the fact that the repayment agreement must be “on terms satisfactory to the agency.” It appears to argue that under this language the guaranty agency retains the discretion to assess collection costs whenever it wants. But this interpretation is inconsistent with the introductory paragraph of the regulation, which makes clear that the agency must provide the borrower an opportunity to enter into a repayment agreement - before collection costs are assessed. Guaranty agencies do not have unfettered discretion to impose whatever collection costs they want, whenever they want, as the argument suggests.[6]
Contrary to USA Funds’ arguments, Bible’s interpretation still gives meaning to the phrase “on terms satisfactory to the agency.” Under her theory, USA Funds retained the discretion to set the terms of the repayment agreement. After all, it transmitted the form document to Bible that became the rehabilitation agreement. It could have insisted on higher monthly payments, for example. USA Funds had the power to set the initial terms of its offer and to reject any proposed counteroffer. It did not have the power, though, to impose collection costs in contravention of § 682.410(b)(5)(ii).
Third, USA Funds points to another provision in the MPN: “If I default, the guarantor may purchase my loans and capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable.” This provision, however, does not displace the guaranty agency’s obligations under 34 C.F.R. § 682.410. The collection fees become “immediately due and payable” only after the guaranty agency has first provided the borrower with (1) written notice that meets the requirements spelled out in subparagraph (b)(5)(vi), (2) an opportunity to inspect and copy agency records pertaining to the loan obligation, (3) an opportunity for administrative review of the enforceability or past-due status of the loan obligation, and (4) an opportunity to enter into a repayment agreement. See 34 C.F.R. § 682.410(b)(5)(ii)(A)-(D). Interpreting the provision as USA Funds suggests would contradict § 682.410(b)(5)(h). Recall, moreover, that USA Funds had told Bible that she owed zero collection costs when she first defaulted. It was not *650 until after she signed the rehabilitation agreement that she finally learned about the costs.
ii. Deference to the Secretary of Education’s Interpretation
Even if the preceding analysis does not provide the best interpretation of the statutory framework and accompanying regulations, the author and Judge Flaum agree the same result would still be correct based on the deference we owe to the Secretary of Education, who is tasked with administering the FFELP and issuing the implementing regulations.
Because the HEA does not define “reasonable collection costs,” Congress “explicitly left a gap for the agency to fill,” Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and delegated to the Secretary of Education authority to “prescribe such regulations as may be necessary to carry out the [Act’s] purposes.” 20 U.S.C. § 1082(a)(1). The Secretary exercised that expressly delegated authority by issuing 34 C.F.R. § 682.410, “which establishes the basic rules for the assessment of collection costs against borrowers who have defaulted on their student loans.” See Black v. Educational Credit Mgmt. Corp., 459 F.3d 796, 800 (7th Cir.2006). The Secretary’s reasonable interpretation of the Act is entitled to substantial deference. See Chevron, 467 U.S. at 843-44, 104 S.Ct. 2778. And the agency’s interpretation of its own regulations is “controlling” unless it is (1) plainly erroneous or inconsistent with the regulation, (2) does not reflect the agency’s fair and considered judgment on the matter in question, or (3) represents a post hoc rationalization advanced by the agency seeking to defend past agency action against attack. Christopher v. Smith-Kline Beecham Corp., 567 U.S.-, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012), citing Auer v. Robbins, 519 U.S. 452, 461-62, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (some citations omitted).
The Secretary’s interpretation of “reasonable collection costs” in 20 U.S.C. § 1091a(b)(l) is reasonable. The Secretary interprets “reasonable” to mean that similar costs must be assessed against borrowers who are at similar stages of delinquency. Under the Secretary’s view, a borrower who promptly enters into a voluntary repayment agreement and complies with that agreement, thereby obviating the need for the guarantor to initiate costly debt collection procedures, is not similarly situated to someone who does not, thereby forcing the guarantor to undertake costly debt collection procedures.
Even if we thought the interpretation urged by USA Funds were better in the abstract, “a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.” Chevron, 467 U.S. at 844, 104 S.Ct. 2778 (footnote omitted); see also Michigan v. EPA, 576 U.S. -, 135 S.Ct. 2699, 2707, 192 L.Ed.2d 674 (2015) (“Chevron directs courts to accept an agency’s reasonable resolution of an ambiguity in a statute that the agency administers.”); Chemical Mfrs. Ass’n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985) (“This view of the agency charged with administering the statute is entitled to considerable deference; and to sustain it, we need not find that it is the only permissible construction that EPA might have adopted but only that EPA’s understanding of this very ‘complex statute’ is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA.”).
USA Funds has not shown that the Secretary’s interpretation is unworthy of *651 deference. The Secretary’s decision to interpret 34 C.F.R. § 682.410(b)(5)(ii) as creating a safe harbor for borrowers in Bible’s position is not plainly erroneous or inconsistent with the regulation. It reflects the agency’s fair and considered judgment on the question. And it does not represent a post hoc rationalization by the agency seeking to defend past agency action against attack. There is no indication from the record that the Secretary has ever taken a contrary position since the regulation was first adopted in 1992. And as explained above, when the Department of Education first issued this regulation, it was merely borrowing from a requirement that had previously been imposed on guaranty agencies under the federal tax refund offset program. See Letter from Lynn B. Mahaffie, Dep’t of Education, Dear Colleague Letter Gen-15-14, at 2-3 (July 10, 2015) (explaining history of the “notice and opportunity to resolve” concept).
In addition, the Secretary took this same position in a legal brief filed in an earlier case in this circuit, Educational Credit Mgmt. Corp. v. Barnes, 318 B.R. 482 (S.D.Ind.2004), ajfd sub nom. Black v. Educational Credit Mgmt. Corp., 459 F.3d 796 (7th Cir.2006), interpreting § 682.410(b)(5) in the same manner it does here. Both its reasoning and its conclusion have remained exactly the same.[7] Cf. Christopher, 132 S.Ct. at 2165-68 (no Auer deference where agency’s interpretation would have imposed “massive liability” for conduct that occurred before the announcement of the interpretation, agency’s announcement was preceded by long period of acquiescence to industry practice, and agency materially changed its reasoning during course of litigation).
To summarize, Bible has alleged sufficiently that USA Funds breached its contract with her by assessing over $4,500 in collections costs after she timely entered into and complied with a monthly repayment agreement, in violation of the applicable regulations that were incorporated into the parties’ contract.
2. Damages
We next address whether Bible has adequately pled damages. USA Funds argues she has not because she defaulted on her loan and continues to owe money on that obligation. This argument is meritless. Of course Bible continues to owe money under her loan obligation. That does not mean she has not been damaged by USA Funds’ imposing over $4,500 in unauthorized collection costs. These costs represent new charges that have been added to her accrued interest and principal, thereby increasing the total amount she owes on her account. Because these charges were not permitted by her contract, she has plausibly alleged damages, even if the remedy might take the form of a credit to her account rather than cash in her pocket. Bible has plausibly alleged a viable breach of contract claim under state law.
B. Preemption and the “Disguised Claim” Theory
We next examine whether federal law preempts or otherwise displaces *652 Bible’s state law claim. “Preemption can take on three different forms: express preemption, field preemption, and conflict preemption.” Aux Sable Liquid Products v. Murphy, 526 F.3d 1028, 1033 (7th Cir. 2008). USA Funds relies on conflict preemption. It also argues that the breach of contract claim is nothing more than a “disguised claim” for a violation of the Higher Education Act and is thus “preempted” by the HEA. Neither theory has merit. Federal law does not preempt or otherwise displace Bible’s breach of contract claim.
1. Conflict Preemption
Conflict preemption can occur in two situations: (1) when “it is impossible for a private party to comply with both state and federal requirements,” or (2) when “state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (citations and internal quotation marks omitted). USA Funds does not contend that it would be impossible, without violating federal law, for it to comply with the state law duty Bible’s suit seeks to impose. Instead, it invokes the second species of conflict preemption known as “obstacle” preemption. USA Funds argues that entertaining Bible’s breach of contract claim would frustrate Congress’s goal of “uniformity” because it would require many state and federal courts to interpret HEA regulations in potentially inconsistent ways. We reject this contention.
This argument proves far too much. Under this theory, conflict preemption would occur any time a court would be required to interpret a regulation to decide a case arising under the common law or other sources of law independent of the. regulation itself. But courts interpret federal regulations all the time without triggering preemption concerns. The mere possibility that a court would need to interpret a regulation does not itself establish preemption. See CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (“To prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they ‘touch upon’ or ‘relate to’ that subject matter....”), citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383-84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); English v. General Electric Co., 496 U.S. 72, 87, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (“Ordinarily, the mere existence of a federal regulatory or enforcement scheme, even one as detailed as § 210 [of the Energy Reorganization Act of 1974], does not by itself imply pre-emption of state remedies.”); Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 717, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (“To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive.”); Keams v. Tempe Technical Institute, Inc., 39 F.3d 222, 226-27 (9th Cir.1994) (holding that detailed regulatory scheme under the HEA did not imply preemption of state tort remedies against accreditors). That is the very point of 34 C.F.R. § 682.410(b)(8), which provides that paragraphs (b)(2), (5), and (6) — the provisions at issue here— preempt only “State law ... that would conflict with or hinder satisfaction of the requirements of these provisions.” (Emphasis added.)
The real question is whether entertaining Bible’s breach of contract claim actually conflicts with the HEA and its associated regulations. It does not. We begin with Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547 (7th Cir.2012), where we *653 dealt with a nearly identical issue in the context of the federal Home Affordable Mortgage Program (HAMP). In Wigod, the plaintiff brought state law claims against her mortgage service provider, including a breach of contract claim alleging that the defendant breached a written agreement that incorporated the HAMP requirements. Like USA Funds in this case, the defendant in Wigod, argued that the state law claims were preempted by the federal guidelines under principles of conflict preemption. We rejected the argument. 673 F.3d at 577-81.
Although Wigod dealt with a different regulatory framework, its reasoning applies directly here. Bible’s claim is that USA Funds breached the MPN by acting contrary to the federal regulations incorporated into the contract. Just as in Wigod, “the state-law duty allegedly breached is imported from and delimited by federal standards.” Wigod, 673 F.3d at 579. In this situation, federal law simply provides the standard of compliance, and the parties’ duties are actually enforced under state law. See id. at 579-80. There is no conflict.
The Fourth Circuit reached the same conclusion regarding the HEA in College Loan Corp. v. SLM Corp., 396 F.3d 588 (4th Cir.2005). In that case, the plaintiff sued Sallie Mae and its affiliates under state law, alleging that they had a contract that incorporated the requirements of the HEA and its regulations. The district court held that the state law claims were preempted. The Fourth Circuit reversed. The court held that the plaintiffs state law claims were not preempted even though they relied on establishing a violation of the HEA and its regulations:
This point is particularly obvious in relation to [plaintiffs] contract claim. As parties to the Agreement, [the parties] voluntarily included federal standards (the HEA) in their bargained-for private contractual arrangement. Both expressly agreed to comply with the HEA. In that context, [defendants’] argument that enforcement of the Agreement’s terms is preempted by the HEA boils down to a contention that it was free to enter into a contract that invoked a federal standard as the indicator of compliance, then to proceed to breach its duties thereunder and to shield its breach by pleading preemption. In this case at least, federal supremacy does not mandate such a result.
Id. at 598 (citations omitted). The Fourth Circuit’s reasoning applies with equal force here.
Unable to distinguish Wigod or College Loan Corp. in meaningful ways, USA Funds seeks help from Chae v. SLM Corp., 593 F.3d 936 (9th Cir.2010). But Chae actually reinforces our conclusion. There, borrowers sued Sallie Mae under state law for its handling of their student loans. Applying principles of conflict preemption, the Ninth Circuit held that the claims were preempted by the HEA because “[permitting varying state law challenges across the country, with state law standards that may differ and impede uniformity” would pose an obstacle to Congress’s purpose in creating the FFELP. Chae, 593 F.3d at 945. The Ninth Circuit, however, carefully distinguished College Loan Corp. on grounds directly applicable here, saying that the plaintiff in College Loan Corp. had “sought to enforce FFELP rules, not to vary them.” Id. at 946, citing 396 F.3d at 591-94. In Chae, though, the plaintiffs were “not'seeking] to buttress the FFELP framework, but rather to alter it in their home state.” Id. They were asking the court to impose a higher standard of compliance than was required by federal law. Such claims are *654 preempted, held Chae, but that reasoning does not apply here.
Like the plaintiff in College Loan Corp. and unlike those in Chae, Bible is not attempting to require more of the defendant than was already required by the HEA and its regulations. She seeks only to enforce the federal standards that the parties agreed to in their contract. This case is therefore not different from Wigod, where we held that state law claims attempting to enforce the requirements of the HAMP guidelines were not preempted by federal law. In Wigod, College Loan Corp., and now this case, the plaintiffs’ state law claims were complementary to, not in conflict with, the federal requirements. Bible’s claim is not preempted by federal law.
2. The “Disguised Claim” Theory
In addition to its formal preemption argument, USA Funds argues that Bible’s state law claim is “preempted” because it is nothing more than a “disguised claim” for a violation of the HEA, and the HEA does not provide a private right of action. We considered and rejected this same theory in Wigod. There the defendant-lender referred to it as an “end-run” theory rather than a “disguised claim” theory. The difference is merely semantic. The defense theory in both cases is that the lack of a private right of action under a regulatory statute necessarily preempts or otherwise displaces a state law cause of action that makes the violation of that regulatory statute an element of the claim. This theory is mistaken at its core: “The absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law. To find otherwise would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead.” Wigod, 673 F.3d at 581 (citation omitted).
USA Funds attempts to distinguish Wigod on two grounds. First, it says there was no administrative enforcement scheme under the HAMP. That is simply not true as a matter of fact. See Spaulding v. Wells Fargo Bank, N.A., 714 F.3d 769, 773-74 (4th Cir.2013) (describing administrative enforcement scheme under HAMP); Wigod, 673 F.3d at 556-57 (same).
Second, USA Funds contends that Wigod is distinguishable because there the Secretary of the Treasury had issued a directive saying that the HAMP must be implemented in compliance with state common law and statutes. See Wigod, 673 F.3d at 580. This does not distinguish Wigod either. We noted that the directive was additional evidence that federal law did not preempt state law. See id. (noting that Department of Treasury’s “tacit view of its program’s lack of preemptive force” was entitled to “some weight”). We did not suggest that our rejection of the end-.run theory depended on this supplemental directive. (In fact, we discussed the supplemental directive in a different section in the opinion.) If anything, there is even less reason to find preemption in this case because USA Funds voluntarily agreed to comply with the only federal requirements that Bible is attempting to enforce. In Wigod, by contrast, the plaintiff had brought claims against the defendant under state tort law in addition to her breach of contract claim.
We reiterate the lesson from Wigod. The absence of a private right of action under federal law provides no reason to dismiss a state law claim just because the claim refers to or incorporates some element of the federal law. Congress’s decision not to supply a remedy under federal *655 law does not necessarily mean that it also intended to displace state law remedies. The lack of a private right of action under the HEA itself does not preclude Bible’s breach of contract claim.
C. RICO Claim
We now turn to Bible’s civil RICO claim alleging a violation of 18 U.S.C. § 1962(c). Section 1962(c) makes it “unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise’s affairs through a pattern of racketeering activity.” 18 U.S.C. § 1962(c). A civil remedy is available under 18 U.S.C. § 1964. To establish a violation of § 1962(c), Bible must eventually prove four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. E.g., Jennings v. Auto Meter Products, Inc., 495 F.3d 466, 472 (7th Cir.2007). USA Funds contends that Bible has failed to allege plausibly the existence of an enterprise, racketeering activity, or a pattern. Whether or not detailed allegations of each element (other than the alleged fraud) are required at the pleading stage, cf. Johnson v. City of Shelby, 574 U.S.-, 135 S.Ct. 346, 347, 190 L.Ed.2d 309 (2014) (per curiam) (reversing dismissal for failure to invoke proper statute in complaint); Runnion v. Girl Scouts of Greater Chicago, 786 F.3d 510, 517-18, 528 (7th Cir.2015) (reversing dismissal of complaint), we find that Bible’s allegations are sufficient. It remains to be seen whether she can marshal evidence to support her claim, but that’s a matter for further proceedings in the district court.
1. Enterprise
RICO defines the term “enterprise” broadly to include “any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.” 18 U.S.C. § 1961(4). An association-in-fact does not require any structural features beyond “a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise’s purposes.” Boyle v. United States, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). But the definition does require that the defendant be a “person” that is distinct from the RICO enterprise. United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 853-54 (7th Cir.2013) (citations omitted). Under § 1962(e), the plaintiff must also establish that the defendant “person” participated in the operation or management of the distinct enterprise. Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).
Bible identifies USA Funds as the defendant “person” for purposes of RICO, and she defines the “enterprise” as an association-in-fact consisting of USA Funds, GRC, and Sallie Mae. She alleges that the members of the enterprise associated for the common purpose of maximizing revenue before, during, and after the loan rehabilitation process by unlawfully imposing collection costs on borrowers who had defaulted. USA Funds uses GRC as its debt collector, and Sallie Mae is the parent company of GRC. Although Sallie Mae and USA Funds are “technically independent,” Sallie Mae has purchased a number of USA Funds’ departments and exerts “extensive financial and operational control” over USA Funds. Am. Compl. ¶ 95.
Our cases have distinguished between two situations: a run-of-the-mill *656 commercial relationship where each entity-acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest. See United Food & Commercial Workers, 719 F.3d at 855 (“This type of interaction, however, shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling ... prescriptions.”); Crichton v. Golden Rule Ins. Co., 576 F.3d 392, 400 (7th Cir.2009) (distinguishing “garden-variety marketing arrangement” comprised of distinct entities from RICO enterprise). This distinction is important. Without it, “every conspiracy to commit fraud that requires more than one person to commit is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation.” Stachon v. United Consumers Club, Inc., 229 F.3d 673, 676 (7th Cir.2000), quoting. Bachman v. Bear, Steams & Co., 178 F.3d 930, 932 (7th.Cir.1999) (footnote and internal quotation marks omitted).
Mindful of this distinction, we conclude that Bible has pled more than a run-of-the-mill commercial relationship. Bible alleges a number of facts permitting the reasonable inference that, with respect to managing accounts before, during, and after the loan rehabilitation process, USA Funds, GRC, and Sallie Mae work as a single enterprise.
First, she alleges an unusual degree of economic interdependence among the entities. According to the amended complaint, USA Funds agreed to place all defaulted loans with Sallie Mae for portfolio management. Sallie Mae was then authorized to refer a large number of the defaulted loans to its “affiliates” or subsidiary debt collectors such as GRC. In addition, USA Funds committed to sell at least half of its rehabilitated loans to Sallie Mae. Under this arrangement, USA Funds not only paid Sallie Mae directly to manage its portfolio but also compensated Sallie Mae indirectly by using its affiliates and subsidiaries for debt collection and by agreeing to sell a large chunk of rehabilitated loans to Sallie Mae.
Second, Bible alleges that the entities do not operate as completely separate entities in managing the loan rehabilitation process. For example, she alleges that: the printout on top of the rehabilitation agreement indicates that it was sent from a Sallie Mae fax machine; in answers to interrogatories in another lawsuit, GRC identified five Sallie Mae officials who had approved and provided input into the wording of GRC’s collection correspondence, including the correspondence at issue in this case; Sallie Mae assumes responsibility for compliance with some of USA Funds’ statutory duties, including the delivery of privacy policies to borrowers; Sallie Mae has agreed to a marketing plan under which Sallie Mae will promote USA Funds as a guaranty agency; Sallie Mae has agreed not to use another guaranty agency unless, despite Sallie Mae’s best efforts, a school or lender insists; associate counsel at Sallie Mae recently appeared at a settlement conference in a Fair Debt Collection Practices Act lawsuit against GRC purporting to have settlement authority on behalf of GRC; and in another FDCPA lawsuit, GRC negotiated a settlement release that covered Sallie Mae and other entities “related to” Sallie Mae, including USA Funds, despite the fact that neither Sallie Mae nor USA Funds were named as defendants in the case.
These allegations distinguish this case from cases like United Food & Commercial Workers, 719 F.3d at 854-55 (noting *657 that complaint failed to allege “that officials from either company involved themselves in the affairs of the other”), and Crichton, 576 F.3d at 400 (noting that plaintiffs claim “begins and ends” with the fraud allegedly committed by individual entity, not enterprise). Taken together, Bible’s allegations indicate a common purpose, relationships among the three entities associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise’s purposes. See, e.g., Sykes v. Mel Hams & Associates, LLC, 757 F.Supp.2d 413, 426-27 (S.D.N.Y.2010) (complaint plausibly alleged RICO enterprise comprised of debt-buying company, debt collection agency, process service company, and others).
USA Funds contends that even if there is an enterprise, USA Funds’ own alleged actions could not amount to participation in the operation or management of the enterprise’s affairs because USA Funds did not operate or manage the collection efforts related to Bible’s defaulted loans. We disagree. Bible alleges that USA Funds “directed GRC to unlawfully and fraudulently impose collection costs [on] borrowers,” Am. Compl. ¶ 88, and that “GRC carried out these instructions.” Id., ¶ 89. She also alleges that GRC secured a release for USA Funds and Sallie Mae in the FDCPA case mentioned above because “both [USA Funds] and Sallie Mae were intimately involved in GRC’s debt collection activities.” Id. ¶ 105.
USA Funds points out that merely performing a service for another entity is not sufficient to establish this element. That is correct as far as it goes. See Goren v. New Vision Int’l, Inc., 156 F.3d 721, 728 (7th Cir.1998) (“Indeed, simply performing services for an enterprise, even with knowledge of the enterprise’s illicit nature, is not enough to subject an individual to RICO liability under § 1962(c); instead, the individual must have participated in the operation and management of the enterprise itself.”). But that principle does not help USA Funds. If we were to apply it here, it might mean that GRC did not participate in the operation or management of the enterprise’s affairs since GRC was hired by USA Funds to perform the debt collection activities. But the same cannot be said for USA Funds, which hired GRC, directed it to impose the collection costs at issue, and was “intimately involved” in GRC’s debt collection activities more generally. Bible’s amended complaint pleads factual content permitting the reasonable inference that USA Funds, in conjunction with Sallie Mae, actually directed the enterprise’s debt collection activities even though GRC was the entity that dealt with the borrower most directly. She has plausibly alleged that USA Funds conducted or participated in the enterprise’s affairs.
2. Racketeering Activity and Fraudulent Intent
USA Funds next argues that Bible has not plausibly alleged racketeering activity. “Racketeering activity” is defined in 18 U.S.C. § 1961(1)(B) to include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. “The elements of mail fraud ... are: ‘(1) the defendant’s participation in a scheme to defraud; (2) defendant’s commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme.’ ” Williams v. Aztar Indiana Gaming Corp., 351 F.3d 294, 298-99 (7th Cir.2003), quoting United States v. Walker, 9 F.3d 1245, 1249 (7th Cir.1993). The elements of wire fraud are the same except that it requires use of interstate wires rather than mail in furtherance of the scheme. E.g., United States v. Green, 648 F.3d 569, 577-78 (7th Cir.2011).
*658 Bible alleges both mail and wire fraud. Her allegations are subject to Federal Rule of Civil Procedure 9(b), which requires her to plead fraud with particularity. E.g., Slaney v. Int’l Amateur Athletic Federation, 244 F.3d 580, 597 (7th Cir. 2001). As a result, Bible “must, at a minimum, describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which'the misrepresentations were communicated, and the identities of the parties to those misrepresentations.” Id.
Bible’s fraud allegations are based on the form default letter and rehabilitation agreement. According to the amended complaint, USA Funds, through its agent GRC, mailed the default letter telling Bible that her loan was in default. The letter said that her “current collection cost balance” and “current other charges” were zero. Like the default letter, the rehabilitation agreement, which was faxed, said that her “current collection cost balance” and “current other charges” were zero. She alleges that USA Funds uses form documents substantially similar to the default letter and rehabilitation agreement in its dealings with thousands of other borrowers who have defaulted on their loans.
Bible’s theory of fraud is that the statements in the default letter and rehabilitation agreement that her “current collection cost balance” and “current other charges” were zero were false, misleading, or contained material omissions. They implied that collection costs would not be assessed against her if she promptly agreed to enter into a repayment program. According to the amended complaint, these statements- were designed to deceive her into entering into the rehabilitation program by concealing the fact that thousands of dollars in collection costs would be imposed by the guaranty agency before she had completed the rehabilitation process.
USA Funds argues that Bible has not plausibly alleged fraud because the collection costs were permitted by federal regulations and because she has failed to allege that USA Funds intended to deceive her. Neither argument can justify dismissal under Rule 12(b)(6). Whether Bible can eventually come forward with evidence of fraudulent intent is a question for the district court on remand.
As discussed above, the collection costs were not permitted by federal regulations, at least as interpreted by the Secretary of Education. In addition, even if the costs had been permitted by the regulations, Bible alleges that USA Funds misled her in its correspondence leading to her agreeing to the repayment program. We recognize that the correspondence to Bible signaled that collection costs could be assessed in the future. Yet that same correspondence said that she owed no collection costs, which could reasonably be understood as implying that there would be nothing to add in the future. A Rule 12(b)(6) motion to dismiss is not a suitable procedure for determining that these documents could not possibly have been misleading to Bible or other borrowers like her.
The question of USA Funds’ intent also cannot be decided on the pleadings. At this stage of the litigation, Bible has plausibly alleged that USA Funds intended to deceive her. See Fed.R.Civ.P. 9(b) (fraudulent intent “may be alleged generally”). She alleges that it sent her a form saying that her collection costs were zero and that it made this representation intending to induce her to enter into a repayment program by hiding that she would be forced to pay over $4,500 in collection costs if she did. These representations could be deemed literally false. Even if they could *659 avoid literal falsity, omission or concealment of material information can be sufficient to constitute mail or wire fraud. See United States v. Morris, 80 F.3d 1151, 1161 (7th Cir.1996) (“We reiterated, moreover, that the statutes apply not only to false or fraudulent representations, but also to the omission or concealment of material information, even where no statute or regulation imposes a duty of disclosure.”); Emery v. American General Finance, Inc., 71 F.3d 1343, 1348 (7th Cir. 1995); United States v. Biesiadecki, 933 F.2d 539, 543 (7th Cir.1991); United States v. Keplinger, 776 F.2d 678, 697 (7th Cir. 1985).
The rehabilitation agreement warned Bible that collection costs could be capitalized at the time of rehabilitation by the new lender. See App. 139 (“Collection costs may be capitalized at the time of the Loan Rehabilitation by your new lender, along with outstanding accrued interest, to form one new principal amount.”); id. (“By signing below, I understand and agree that the lender may capitalize collection costs of 18.5% of the outstanding principal and accrued interest upon rehabilitation of my loan(s).”). One straightforward reading of this language is that it authorized the new lender — not the guaranty agency — to capitalize existing collection costs, not to impose new ones, and then only after rehabilitation is complete (i.e., after the guaranty agency has sold the loan to a private lender).
At this preliminary pleading stage, we do not know USA Funds’ state of mind when it sent the default letter or rehabilitation agreement. Bible has plausibly alleged that the statements in the default letter and the rehabilitation agreement were designed to induce her to enter into the repayment agreement while concealing that she would be assessed over $4,500 in collection costs if she did so. Her allegations of racketeering activity should survive the Rule 12(b)(6) motion to dismiss.[8]
3. Pattern
We turn next to USA Funds’ argument that Bible has failed to allege a pattern of racketeering activity. “A pattern of racketeering activity consists, at the very least, of two predicate acts of racketeering committed within a ten-year period.” Jennings v. Auto Meter Products, Inc., 495 F.3d 466, 472 (7th Cir.2007), citing 18 U.S.C. § 1961(5). To prove a pattern, Bible will need to satisfy the “continuity plus relationship” test, which requires that the predicate acts be related to one another (the relationship prong) and that they pose a threat of continued criminal activity (the continuity prong). Id. at 473, quoting Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1022 (7th Cir.1992). The relationship prong is satisfied “if the criminal acts ‘have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.’ ” DeGuelle v. Camilli, 664 F.3d 192, 199 (7th Cir.2011), quoting H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 240, *660 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The continuity prong is satisfied by showing either that the criminal behavior, although it has ended, was so durable and repetitive that it “carries with it an implicit threat of continued criminal activity in the future,” Midwest Grinding Co., 976 F.2d at 1023, or that the past conduct “by its nature projects into the future with a threat of repetition,” H.J. Inc., 492 U.S. at 241, 109 S.Ct. 2893.
Whether or not Bible needed to plead details of her pattern theory, cf. Runnion v. Girl Scouts, 786 F.3d at 528, Bible’s allegations satisfy the relationship-plus-continuity test. She alleges that USA Funds, through its enterprise, unlawfully imposed collection costs on thousands of borrowers in default in the same manner it did to her. She alleges that USA Funds has sent the form document that became the rehabilitation agreement in this case more than 100,000 times over a period of several years. Bible also alleges that the conduct at issue is USA Funds’ standard operating procedure and that it is continuous and ongoing. These allegations satisfy the relationship-plus-continuity test. See, e.g., Corley v. Rosewood Care Center, Inc., 142 F.3d 1041, 1050 (7th Cir.1998) (relationship-plus-continuity test satisfied where plaintiff alleged defendant systematically overcharged residents at several nursing homes).
4. Preemption
We have one last loose end to tie up: the district court determined that Bible’s RICO claim was “preempted” by the Higher Education Act. See Bible v. United Student Aid Funds, Inc., 2014 WL 1048807, at *10. It is well settled that federal law does not preempt a federal law claim alleging a violation of another federal statute. Preemption is limited to conflicts between federal and state law. The alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute is another issue entirely. See POM Wonderful LLC v. Coca-Cola Co., 573 U.S. -, 134 S.Ct. 2228, 2236, 189 L.Ed.2d 141 (2014).
Realizing that the HEA does not preempt the RICO claim, USA Funds argues instead that the absence of a private-right of action under the HEA precludes Bible’s RICO claim because Bible’s RICO theory alleges only a violation of the HEA. USA Funds relies principally on McCulloch v. PNC Bank Inc., 298 F.3d 1217, 1226-27 (11th Cir.2002) (per curiam), and United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co., No. 12 C 204, 2012 WL 3061859, at *4 (N.D.Ill. July 26, 2012), aff'd on other grounds, 719 F.3d 849 (7th Cir.2013), for the proposition that non-compliance with a regulatory statute that does not itself provide a private right of action necessarily forecloses any RICO claim based on that non-compliance.
We are skeptical of this legal principle (our court has never adopted it), but we need not decide that question now-because it is not presented by Bible’s allegations. USA Funds’ argument simply mischaracterizes Bible’s theory. Her RICO claim is not based on regulatory non-compliance. It is based on alleged misrepresentations and deception in the default letter and the rehabilitation agreement. Even if the regulations permitted USA Funds to assess the collection costs, Bible alleges that USA Funds committed fraud by concealing that these collection costs would be imposed when it sent the default letter and the rehabilitation agreement. Thus, Bible’s RICO claim does not necessarily require her to prove that USA Funds violated the HEA or its regulations, even if such proof *661 might strengthen her claims.[9] Even if we agreed with McCulloch and the district court in United Food & Commercial Workers on this issue, neither decision considered this alternative theory Bible is pursuing. See McCulloch, 298 F.3d at 1226-27 (lenders’ failure to comply with HEA disclosure obligations was not actionable under RICO); United Food & Commercial Workers, 2012 WL 3061859, at *4 (noting that plaintiffs RICO claim depended on violation of regulatory statutes referenced in complaint). The absence of a private right of action under the HEA itself does not preclude Bible’s RICO claim.

Conclusion

Neither of Bible’s claims is preempted or otherwise displaced by federal law, and she has plausibly alleged all of the elements of both claims. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings.

. Bible also attached to her amended complaint a legal brief filed by the Secretary of Education in Educational Credit Mgmt. Corp. v. Barnes, No. NA 00-0241-C-B/S (S.D.Ind.); GRC’s interrogatory responses in Bible v. General Revenue Corp., No. 12-CV-01236 (D.Minn.), and a June 26, 2008 newspaper article from The Chronicle of Higher Education concerning a contract between USA Funds and Sallie Mae. The brief was included as persuasive authority on a legal question. These two exhibits are not evidence, of course. When offered by a party opposing a Rule 12(b)(6) motion, however, and without converting the motion to one for summary judgment, such documents may be used to illustrate facts the party would be prepared to prove at the appropriate stage of the proceedings. A party opposing such a motion is free ■to elaborate upon the facts in a brief. See, e.g., Chavez v. Illinois State Police, 251 F.3d 612, 650 (7th Cir.2001) (court reviewing dismissal under Rule 12(b)(6) will consider new factual allegations on appeal provided they are consistent with complaint); American Inter-Fidelity Exchange v. American Re-Insurance Co., 17 F.3d 1018, 1022 (7th Cir.1994) (plaintiff may point to facts consistent with complaint to show ability to prevail); Early v. Bankers Life & Casualty Co., 959 F.2d 75, 79 (7th Cir.1992) (plaintiff may allege additional facts without evidentiary support to oppose motion to dismiss). There is no reason she may not also add even non-evidentiary materials (such as newspaper articles) to illustrate what she plans to prove, especially in light of the post-Iqbal uncertainty about the federal pleading standard of "plausibility.”

. The FFELP regulations have been revised several times since 2006, when Bible signed the MPN. Her MPN provides that any amendment to the HEA and its associated regulations "governs the terms of any loans disbursed on or after the effective date of such amendment, and such amended terms are hereby incorporated into this MPN.” App. 122. The amended complaint does not specify when disbursements to Bible took place. In the absence of any dispute, and because Bible defaulted in 2012, we apply the regulations that were in effect between July 1, 2010 and June 30, 2014.

. USA Funds argues that the rehabilitation agreement is not a valid contract because it was not supported by consideration. We do not reach this issue because Bible's breach of contract claim alleges a breach of the MPN, not the rehabilitation agreement.

. Again, this opinion cites and quotes the-versions of the statutes and regulations applicable to Bible’s loan. For example, the 18.5% cap on collection costs has since been reduced to 16%.

. Some loans, such as loans for which a judgment has already been obtained, are exempted from this provision. See 34 C.F.R. § 682.405(a)(1). None of these exemptions is relevant here.

. A "rehabilitation” agreement is one type of authorized "repayment agreement.” See 34 C.F.R. § 682.405(a)(2) (a loan is “rehabilitated” after the borrower has voluntarily “made and the guaranty agency has received nine of the ten payments required under a monthly repayment agreement ”) (emphasis added); see also 20 U.S.C. § 1078-6(a)(4) (provision authorizing loan rehabilitation refers to borrower making “scheduled repayments”); accord, Letter from Lynn B. Mahaffie, Dep’t of Education, Dear Colleague Letter Gen-15-14, at 5 (July 10, 2015) (“Thus, a rehabilitation agreement is simply a specific form of a satisfactory repayment agreement.”).

. See App. 54-55 (“Department rules require the guarantor who acquires a loan by reason of the default of the borrower ... to charge collection costs only after providing the debt- or an opportunity to contest the debt and to enter into a repayment arrangement for the debt.... The regulations therefore direct guarantors to charge collection costs only to those debtors who cause the guarantor to incur collection costs by failing to agree promptly to repay voluntarily.... Only those defaulters who ignore this opportunity face collection cost charges.”) (emphases added).

. On the RICO claims, USA Funds repeats the same argument it made on Bible's breach of contract claim, contending that she has failed to allege an injury. For the same reasons, we reject this contention. Bible’s alleged injury is that she made monthly payments for costs she did not owe, which constitutes a financial loss. Nothing more is required to plead an injury under § 1962(c). See Harneo, Inc. v. American Nat’l Bank & Trust Co. of Chicago, 747 F.2d 384, 398 (7th Cir.1984) (holding that plaintiffs' allegations of excessive interest charges resulting from defendants' alleged fraudulent scheme to overstate the prime rate satisfied the injury requirement), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

. Suppose discovery or a former employee showed that USA Funds included certain language in the default letter or. rehabilitation agreement to hide the extent of its non-compliance with the regulations. That might indicate that USA Funds intended to defraud borrowers, who might have reasonably relied on the regulatory framework to protect them. The point for our purposes, though, is that a violation of the HEA and its regulations is not essential to Bible’s fraud claims. Even if the collection costs were permitted by the regulations, Bible’s theory is that statements in the form documents sent to her were misleading.